# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1477

_____

Naing Tun,                                  *
                                            *
            Petitioner,                     *
                                            *    Petition for Review of an Order of
      v.                                    *    the Board of Immigration Appeals.
                                            *
Alberto Gonzales, Attorney General          *
of the United States,                       *
                                            *
            Respondent.                     *

_____

Submitted: October 20, 2006
Filed: May 21, 2007

_____

Before MELLOY, BENTON, and SHEPHERD, Circuit Judges

_____

MELLOY, Circuit Judge.

Naing Tun ("Petitioner") conceded removability and sought asylum, withholding of removal, relief under the Convention Against Torture ("CAT"), and voluntary departure. An Immigration Judge ("IJ") denied all forms of relief, and the Board of Immigration Appeals ("Board") affirmed. Petitioner now seeks review of the Board's order.

The Board determined that asylum relief was unavailable because Petitioner failed to file his asylum application within one year after entering the United States. We are without jurisdiction to review that determination. See Yakovenko v.

Gonzales, 477 F.3d 631, 635 (8th Cir. 2007) (holding that a finding of untimeliness is a factual finding shielded from our review by 8 U.S.C. § 1158(a)(3)). The denial of relief on the withholding of removal and CAT claims was based on an adverse credibility determination. As to these claims, we reverse and remand for further proceedings. We hold that the improper and prejudicial exclusion of evidence coupled with unreliable translation denied Petitioner a fair hearing in violation of his due process rights under the Fifth Amendment of the United States Constitution.[1] We need not address the parties' arguments as to whether we have jurisdiction to review the Board's denial of voluntary departure. Our remand on the other issues moots the Board's ruling on voluntary departure and requires a reopening of the record.

I.    Background

      A.    General Background

Petitioner is a native and citizen of Burma and a member of Burma's minority Arakan ethnic group. He entered the United States in February 1997 at New York, New York, as a non-immigrant crewman in transit with authorization to remain in the United States until March 6, 1997. He overstayed this authorization, was found removable, and sought relief alleging torture, past persecution, and a fear of future persecution. The IJ handling his case excluded a physician's affidavit and testimony that would have explained how scars and markings on Petitioner's body, as well as Petitioner's current medical and psychological symptoms, were consistent with claims of torture at the hands of Burma's ruling military regime. The IJ also excluded an

_____

      [1]Although we do have jurisdiction to review constitutional-based challenges to timeliness determinations, see, e.g., Munoz-Yepez v. Gonzales, 465 F.3d 347, 351 (8th Cir. 2006) (finding jurisdiction under 8 U.S.C. § 1252(a)(2)(D), to review questions of law and constitutional claims related to asylum-related timeliness determinations), the due process violation in the present case is unrelated to the Board's timeliness determination.

affidavit from a country conditions expert. The expert's affidavit spoke directly to a critical, contested issue in the case, namely, the degree of surveillance exercised by the military regime over mail and communications and the difficulty of obtaining and sending documents from Burma. Also, at Petitioner's hearing before the IJ, a native speaker of Burmese interrupted the proceedings to inform the IJ that the official translator was not correctly translating the questions and answers. Consistent with these claims of translation problems, Petitioner repeatedly had trouble understanding the questions asked by the IJ and attorneys and frequently provided answers that did not make sense in light of the questions that were asked. After the hearing, Petitioner submitted an affidavit from the native speaker detailing alleged translation errors, but the IJ declined to accept the affidavit, found no evidence of translation errors, found Petitioner non-credible, and denied relief. The Board affirmed in a four page opinion.

Because this case involves a challenge to an adverse credibility determination, alleged translation errors, excluded evidence, and an alleged deprivation of due process, it is necessary to review in detail the applications, affidavits, testimony, and other evidence admitted into and excluded from the proceedings below.

B.    Application, Amended Application, and Accompanying Affidavits and Documents

Petitioner filed an initial pro se application, an amended application with a supporting affidavit, and supporting documents. The documents included a 1996 letter from Han Nyunt, a man who claimed that he protested in Burma with Petitioner in December 1996. Nyunt also claimed that military police arrested him, showed him pictures of Petitioner, and questioned him about Petitioner. Other documents included: State Department Human Rights Reports on Burma for 1997, 1998, and 2003; a document Petitioner identified as a Burmese warrant for his arrest dated October 1998; a March 2002 membership card for a pro-democracy opposition group in Burma, the National League for Democracy; and a July 2002 document stating that Petitioner was a member of a group called the Arakan League for Democracy.

Petitioner also submitted a written report from Dr. Sharon Frye, a physician Petitioner offered as an expert in physical and psychological trauma. Finally, Petitioner offered a written report regarding country conditions in Burma prepared by Professor David Steinberg, the Director of Asian Studies at Georgetown University's School of Foreign Service.

In his initial, pro se application, Petitioner made the following claims. His younger brother was killed in a 1988 student demonstration. Also in 1988, Petitioner "[a]ctively took part in the mass demonstrations as a member of [the] Local Citizen's Committee of my township of South Okkalapa." Petitioner joined a group called the National League for Democracy after a 1988 coup that brought the present military regime to power in Burma. In 1990, before an election, he was arrested with other workers from the Local Citizen's Committee and incarcerated for nearly three years at Insein Prison, where he "faced persecution, interrogations, threats and [was] forcibly put into solitary confinement." He took part in demonstrations in late 1996, shortly before he left the country in February 1997.

In his amended application, prepared with the assistance of counsel, Petitioner stated, "In 1990 I was arrested, beaten, and interrogated because of my political activities. I was incarcerated for over three years during which time I was tortured, interrogated, and forced to do hard labor. I was released only after signing a document stating that I would abstain from politics." He also claimed that a warrant was issued for his arrest in 1998, and security agents still visited his family and asked about him. He feared "indefinite incarceration, beatings and torture" because of his race, political activities and memberships in the National League for Democracy, the Arakan League for Democracy (which he joined after arriving in the United States) and the Local Citizen's Committee. He did not apply for relief immediately upon arrival in the United States because he "wanted to see if the situation in Burma improved." He applied for relief in June 1999. This was shortly after the INS issued

-4-

its notice to appear and shortly after the date he alleges that he learned of the 1998 arrest warrant.

In his affidavit accompanying the amended application, Petitioner provided additional details regarding alleged abuse and torture that followed his 1990 arrest. Petitioner alleged he was arrested by military agents and detained for several months at Tauck Kyant military headquarters near Rangoon. There, he was asked about his political activities. When he refused to respond, his persecutors hanged him naked from the ceiling, beat him with bamboo batons, electrically shocked his back, chest, genitals, and shoulders, sodomized him with a rough wooden pole, beat him with rubber batons, and kicked and punched him. He was denied medical attention and still bears physical scars and suffers headaches and memory loss as a result of the torture. He then faced trial without counsel and without any appeal rights. He was convicted of political agitation and imprisoned at a prison facility called Insein where, again, he was beaten. He was later moved to a work camp where he was subjected to forced labor. He was required to break rocks, mix feces for fertilizer, and plant trees, all while wearing shackles on his legs and a collar around his waist.

C.    Expert Opinions

As the first order of business at an April 29, 2004 hearing before the IJ, the government objected to the use of Professor Steinberg's report on conditions in Burma. The government did not suggest that Professor Steinberg was in any manner unqualified to offer insight regarding current conditions in Burma nor did it suggest that any evidence existed to indicate bias, lack of credibility, or lack of qualifications on the part of Professor Steinberg. Rather, the government argued that Petitioner should not be allowed to use Professor Steinberg as an expert because Professor Steinberg was not made available for cross-examination. Counsel for Petitioner noted that the immigration court in St. Louis had recognized Professor Steinberg as an expert on at least four prior occasions and that his credentials showed on their face

that he was well-qualified to address country conditions in Burma. Professor Steinberg was a former employee of the U.S. Department of State, had published more than twelve books and forty articles about Burma and East Asia, and had taught numerous classes on Burma and East Asia. Notwithstanding these qualifications, the IJ concluded, "since the Government doesn't have the opportunity to cross-examine him, that document will not be given any weight."

As the next order of business, counsel for Petitioner sought to enter Dr. Frye's written report and have Dr. Frye testify as an expert in the fields of physical and psychological trauma. In her written report, Dr. Frye explained the background information Petitioner had given to her regarding his time in Burma. That information was consistent with Petitioner's applications, affidavits, and testimony (as detailed below). She then described his current physical and psychological condition, which she had determined by personally examining Petitioner in early February prior to the hearing. She stated:

> [T]here is spinal tenderness at the level of lumbar region . . . [and] a 2 cm curved scar on the left shoulder. There are three 1 cm scars at the level of the left shoulder. There is a 1 cm round scar at the level of the thoracic spine. There are two 3 mm hyperpigmented areas over the spine. There is a 3 cm linear curved scar on the medial aspect of the left knee. There is a 1 cm scar on the left pretibial surface. There is a 1.5 cm scar on the medial aspect of the left lower extremity. There is a 1 cm round scar on the left lateral ankle. There is circumferential hyperpigmentation around the ankles bilaterally. On the left buttock there is a 5 cm round hyperpigmented brown area.

She concluded:

> Based on my examination it is my assessment that Mr. Tun suffers from symptoms consistent with post-traumatic stress disorder resulting from his imprisonment and torture. Post-traumatic disorder is a set of characteristic symptoms that develop following a psychologically

-6-

distressing event such as torture which is considered to be outside the range of normal experiences. These symptoms in Mr. Tun's case include but are not limited to difficulty sleeping, nightmares, a sense of being lost in life, and increasing irritability. In addition, he develops periods of anger, and nausea and dizziness based on cues from his experiences. *He has residual pain in his back which is consistent with his description of wearing the metal collar around his waist and also be[ing] beat[en] on many occasions with batons. His scars are consistent with the use of a stun gun-like apparatus, multiple beatings and wearing of collars around the ankles. Although he remembers the association of some scars with the specific types of torture he cannot remember all.* Mr. Tun suffers from memory loss due to the torture, malnutrition, sleep deprivation, and harsh living conditions.

(Emphasis added).

When Petitioner sought to have Dr. Frye testify, the IJ expressed concern that Petitioner's government-provided interpreter had to make a six o'clock flight. The IJ apparently wanted Petitioner to testify first so that the interpreter could be released in time to make the flight. The parties agreed to this order for questioning the witnesses. Dr. Frye was about to leave the proceedings and wait outside when the IJ, apparently anticipating the dismissal of Dr. Frye, decided it would be more efficient to address her qualifications as an expert before allowing Petitioner to testify. The IJ permitted voir dire during which Dr. Frye explained her qualifications.

According to Dr. Frye's testimony during voir dire and the statement of qualifications in her written report, she had worked as an emergency room trauma nurse from approximately 1975 into the early 1980s. She then went to medical school in West Virginia and was licensed by the State of Missouri to practice medicine in 1985. She has been a practicing physician since that time. She now works as an Associate Professor of Internal Medicine at the Saint Louis University Health Sciences Center in the Division of Infectious Diseases and Immunology. She is fully trained and board certified in internal medicine and infectious diseases. In that

capacity, she has seen and diagnosed many patients who have been physically or psychologically traumatized. She sees many victims of trauma who have developed infections secondary to their trauma and these victims often have psychological as well as physical symptoms.

In addition, Dr. Frye volunteers with Physicians for Human Rights Asylum Network. This group's main purpose is the documentation and exposure of instances of human rights abuses. Her participation includes travel to war-torn countries to offer medical assistance and document conditions. She traveled to Zaire, Bosnia, Tajikistan, Kosovo, Afghanistan, Ukraine, Belize, Rwanda, Uganda, and India, but not Burma. Dr. Frye's volunteer work for the group also involves providing assistance to asylum applicants in the form of medical evaluations and assistance in the preparation of affidavits. Her role on the domestic side involves interviewing and examining applicants to make sure their symptoms are consistent with their claims and identify any false allegations of torture. She acted in a pro bono capacity for Petitioner.

The IJ believed Dr. Frye was well-qualified in the area of internal medicine but expressed concern at Dr. Frye's qualifications to offer an opinion regarding physical and psychological trauma. The IJ claimed to have read Dr. Frye's report but appeared to ignore Dr. Frye's extensive experience with victims of physical trauma, the fact that Petitioner offered Dr. Frye as an expert in the area of physical trauma (not just psychological trauma) and the fact that Dr. Frye directly connected Petitioner's actual physical scars and symptoms to his claims of torture and abuse.

The IJ concluded that Dr. Frye was not qualified to serve as an expert because she had not been to Burma, her primary area of practice was internal medicine rather than trauma or psychiatry, and her organization, the Physicians for Human Rights Asylum Network, "seems to be more of an advocacy group than anything to do with treatment."

D.    Testimony

After dismissing Dr. Frye, the IJ and the attorneys questioned Petitioner through the interpreter. Petitioner relayed the following information in his testimony. His mother had been active in politics when he was young but was arrested and interrogated and, as result, ceased her involvement in politics. She had not been harassed by the military since that time, other than general surveillance and questioning regarding Petitioner. In 1988, after security forces shot and killed Petitioner's brother, Petitioner and his family were not able to obtain the brother's body nor were they able to obtain a death certificate; the military rulers of Burma would not issue death certificates for persons who died in demonstrations. Petitioner testified that he was motivated by, and became active in politics following, the killing of his brother. Petitioner organized group demonstrations and eventually joined the National League for Democracy. He became a township organizer for the National League for Democracy in the township of South Okkalapa.

Petitioner elaborated upon his description of his arrest and incarceration. He was arrested by security police in 1990 and tortured at military intelligence headquarters at Tauck Kyant. His persecutors were ethnic Burmans. He was beaten, raped, locked in a small, dark, wet cell, and deprived of medical attention and adequate food. He was tried without process, sentenced, and taken to Insein prison. There, again, he was beaten by officers, but a doctor provided some medical aid. When authorities discovered the doctor was being kind to political prisoners, the doctor was sent away. Petitioner was then moved to a work camp at Htoogyi. There he wore chains and iron rings around his back and feet, he could not walk freely, and he was forced to break rocks and plant trees. He testified that, at the work camp, he was made to do more than other prisoners and he believed this was because of his race. At the work camp, the only physical abuse other than the forced labor and shackles was kicking to make the prisoners work more.

In all, Petitioner was incarcerated for over three years. He spent about three months at the work camp and was allowed no visitors while at military headquarters or at the work camp. His family was allowed to visit him once a month at Insein prison, but on some visits, they were not allowed to see him because of his wounds. He was released from the work camp in December 1993 after he signed a form agreeing not to participate in political activities.

After he was released, he went to a medical clinic to be treated for injuries from beatings and from the chains he was forced to wear. He then was unable to find employment because people knew of his past political activities and his imprisonment, and they did not want to be involved with him. He was on a sort of probation and had to sign in periodically at a police office. He described being watched by government agents and being questioned at his home.

Petitioner resumed political activities in 1995 after the funeral of Burmese political figure and former prime minister U Nu. Fearing retribution, he fled to Shan state, a different political subdivision in Burma, near the Thai border. In Shan state, Petitioner met, was befriended by, and obtained work from the owner of a vineyard. Petitioner returned to Rangoon in October and December 1996 to see his wife and parents and to participate in political demonstrations. While in Rangoon during this time, Petitioner claims that he stayed in a home owned by his employer from Shan state. After Petitioner participated in a demonstration that police broke up, he fled again to Shan state. A friend of Petitioner, Saw Naing, was arrested at the demonstration.

In February 1997, Petitioner was able to leave Burma on a plane after his employer obtained travel documents for him. Petitioner came to the United States. Communications with persons in Burma were difficult because government agents conducted surveillance of his family's home in Burma, listened to telephone communications, and read private mail. He could talk to his family on a limited basis,

however, because they spoke Arakanese, and the government agents spoke only Burmese. Petitioner's family was questioned by military intelligence officers. The military government sent an arrest warrant to Petitioner's family's home in October 1998. Petitioner received a copy of the arrest warrant in June 1999. His father sent the warrant to the United States using the Burmese postal system. Petitioner's father died in 2003. A person from Burma who came to the United States brought Petitioner a copy of his father's obituary. Petitioner spoke to the family of a friend, Hen Nyunt, who was arrested at a 1996 demonstration. The family told Petitioner that intelligence officers had questioned Nyunt about Petitioner.

Later, Petitioner received a letter from Nyunt stating that Petitioner should not return and that the military government had asked about Petitioner and shown Nyunt a picture of Petitioner participating in a demonstration. The letter arrived via DHL. On cross-examination, there was a good deal of questioning regarding surveillance, the danger to Petitioner's family in using the postal system, the use of DHL rather than use of the postal system, and the difficulty, impossibility, or danger inherent in trying to obtain government documents. Ultimately, Petitioner stated that his family used the postal system at their own risk when they sent him the warrant, that surveillance varied from being very tight at times to being less tight at other times, and that DHL was generally more secure and less likely to be screened by the military intelligence. Petitioner explained that his family was not able to obtain government documents because he had been involved in politics, so he didn't have a death certificate regarding his father or prison records for his own incarceration. Petitioner explained that the warrant was delivered to his family's home and that it was not a document that his family had to seek from the government. Petitioner also stated that he did not seek an affidavit or letter from his employer in Shan state because he felt the employer had already done enough to help and Petitioner did not want to bother him further. Finally, Petitioner stated that he did not have a death certificate regarding his father because he had not asked the person who came to the United States and brought the obituary to bring a death certificate.

During the hearing, there were at least a dozen instances where Petitioner indicated that he did not understand the questions posed by the translator and at least a dozen other instances where Petitioner's responses, provided to the court by the translator, were confusing or not directly responsive to the questions originally asked in English. The IJ and the Board discussed examples of these confusing exchanges and relied upon the IJ's view of these confusing exchanges in finding Petitioner to be not credible. We do not discuss each exchange, but rather, focus on those exchanges identified by the Board and the IJ.[2]

---

[2]A few examples of such exchanges are as follows:

Q. Didn't you just say they didn't mistreat you?
A. Yes, I did.
Q. Okay. And, now you're saying that they took you out and tortured you?
A. Yes.
Q. Do you know what mistreatment means?
A. Yes, I do.
Q. Okay.

. . .

Q. Okay. Did you go back to Rangoon, after you arrived in Shan state?
A. Yes, I did.
Q. When was that?
A. Around '96.
Q. What month?
A. '96, around October and December.
Q. Okay. And, why did you go back to Rangoon?
A. It was because I missed my mother and father, I missed my wife, I missed my children, and, at that same time, at that time, the students were demonstrating.
PETITIONER'S COUNSEL TO JUDGE.
    Your Honor, I think, I object to the interpretation. He didn't –
UNIDENTIFIED PERSON TO JUDGE.

-12-

He didn't say the children.
PETITIONER'S COUNSEL TO JUDGE.

He didn't say children. He has no children.
INTERPRETER TO JUDGE.

What do mean by –
JUDGE TO PETITIONER'S COUNSEL.

I'm sorry. Just a minute.
INTERPRETER TO JUDGE.

I'm sorry.
JUDGE TO PETITIONER'S COUNSEL.

This is the official interpreter. He heard what he said. He went back because he missed his wife, he missed his parents, and he missed his children. I don't believe the correct translation –
PETITIONER'S COUNSEL TO JUDGE.

I don't believe he said children, Your Honor. Someone else here speaks Burmese and –
JUDGE TO PETITIONER'S COUNSEL.

I'm asking him.
PETITIONER'S COUNSEL TO JUDGE.

– is indicating he just –
JUDGE TO UNIDENTIFIED PERSON.

What did he say?
UNIDENTIFIED PERSON TO JUDGE.

He said the parent, and his wife.
JUDGE TO INTERPRETER.

Interpreter, is that what you heard?
INTERPRETER TO JUDGE.

Well, I, (indiscernible) the respondent said that he didn't mention the children.
JUDGE TO INTERPRETER.

So, only missed his wife and parents?
INTERPRETER TO JUDGE.

Parents. And there was also a demonstration, students' demonstration at that time.

-13-

E.    Motion to Supplement the Record and Motion for a New Hearing

After the April 29 hearing, Petitioner filed a motion to supplement the record with an affidavit from the native Burmese speaker who attended the hearing and attempted to speak during the hearing. The government resisted the motion and Petitioner responded, asking for new hearing. In the affidavit, the native speaker indicated specific instances of incorrect translation and stated that, in his assessment, approximately twenty percent of the translation contained errors. Examples referenced by the native speaker included, inter alia, the above-referenced claim by the translator that Petitioner had made reference to his children, when Petitioner, in fact made no reference to children and, in fact has no children; the translator's misuse and interexchange of general terms like "mistreated" and "beaten" with more specific terms like "raped" and "tortured like before" leading to confusion regarding when, how often, and at which location Petitioner experienced torture during his incarceration; the interpretation of questions about when Petitioner met his wife as questions regarding when Petitioner married his wife; and questions about his hometown rather than questions about his place of birth. According to Petitioner, these and other passages in the transcript led to confusion and delay in Petitioner's answers and confusing, contradictory answers that contributed to the IJ's overall impression regarding Petitioner's credibility.

F.    IJ Decision

The IJ restated her conclusions regarding Dr. Frye in her written decision: "Even if Dr. Frye could have established that she was an expert, her testimony would have been given less weight because of her activities with refugees. Ultimately the Court found that Dr. Frye was not an expert in the area offered and she was excused." The IJ then addressed Petitioner's testimony at length. In concluding that Petitioner was not credible, the IJ stated, "[t]he [Petitioner's] sworn testimony was inconsistent with his asylum application and it was not sufficiently corroborated by his supporting

documents." The IJ's analysis of Petitioner's credibility focused on three main areas of concern: (1) alleged inconsistency between Petitioner's affidavit and his testimony concerning the conditions of his confinement at Insein prison; (2) the issue of obtaining corroborating documents via regular post or DHL, the issue of the surveillance of his family in Burma, and the danger to his family in sending materials to Petitioner; and (3) the differences between his original and amended asylum applications and the lack of detail in the original application. The IJ also cited other, miscellaneous inconsistencies.

Regarding his treatment as a prisoner, the IJ stated that Petitioner's affidavit was "for the most part" consistent with his testimony regarding his treatment while in custody at military headquarters in Tauck Kyant, but Petitioner "failed to testify to certain details he mentioned in his affidavit," such as being required to drink his own urine when water was not provided. The IJ then stated that Petitioner's testimony was inconsistent with his affidavit regarding the conditions during his imprisonment at Insein Prison. The IJ characterized Petitioner's affidavit as claiming that he was "tortured once a month . . . beaten with batons and punched . . . tortured, then put in solitary, then tortured, and returned to solitary." The IJ then described Petitioner's testimony regarding Insein Prison as follows: "[H]e first said he was not mistreated at Insein, but then said he was tortured. He said he was tortured only twice, and after being put in solitary he was returned to his regular cell. He said he was hit with rifles and military boots[,] claimed he was not mistreated at Insein but then said he was tortured."

Regarding Petitioner's ability to obtain documents, the IJ noted that Petitioner repeatedly stated that he could not obtain documents from the government, but the IJ found it inconsistent that Petitioner had been able to obtain the arrest warrant. The IJ also said it was inconsistent that Petitioner was able to obtain a passport and leave the country in light of the arrest warrant and it was inconsistent that Petitioner's father was able to mail the arrest warrant when Petitioner stated it was not possible for his

family and friends to use the mail to send affidavits because they were under surveillance. Also, the IJ stated there was an inadequate explanation as to why his family couldn't use DHL.

Regarding the addition of detail between the original and amended asylum applications, the IJ noted the omission from the initial application of "details regarding his arrest, detainment, rape, or torture" and the omission of any reference to having been a political organizer or leader, living in Shan state or receiving the assistance from the employer in Shan state. The IJ recognized that Petitioner had assistance of counsel in preparation of the amended application.

Finally, regarding other inconsistencies, the IJ noted that Petitioner's mother remains in Burma unharmed even though she used to be active in politics, petitioner stated in his affidavit that he spent several days in a medical clinic after release from prison but testified that he only spent one day at a medical clinic, and Petitioner failed to submit his National League for Democracy membership card until 2004 even though it was purportedly issued in 2003.

The IJ then addressed the fact that Petitioner had moved to reopen the record or hold a new hearing and had submitted an affidavit from the native Burmese speaker who was present at the hearing. Notwithstanding claims in the native speaker's affidavit regarding language proficiencies, the IJ found "no evidence proving [the native speaker's] abilities in either Burmese or English," and the IJ refused to permit Petitioner to supplement the record. The IJ made no comment as to Petitioner's confusing and non-responsive answers or instances where Petitioner was unable to understand the questions posed by the interpreter, and the IJ apparently did not consider these exchanges to be evidence of poor translation.

Based on the adverse credibility ruling, the IJ denied relief.

-16-

G.    Board Decision

The Board reviewed the IJ's opinion, finding no clear error in the IJ's credibility determination. The Board addressed a few of the claimed translation errors, and stated, "The [IJ] only relied on two of the cited errors in making her adverse credibility determination . . . the testimony that [Petitioner] was not mistreated but was tortured at Insein prison and . . . the amount of times he was beaten at Insein prison." The Board chose six instances of alleged inconsistencies between Petitioner's affidavit and his testimony and described how the Board believed the record supported the IJ's finding of inconsistencies. We address these inconsistencies in our analysis below.

The Board also made fine distinctions in addressing what it perceived to be inconsistencies between the original and amended applications. For example, Petitioner described his brother's death as the catalyst for his own involvement in political activities, and listed May 13, 1988 as the date of death in one instance. In another instance, he gave May 18, 1988 as the date of his brother's death. The Board seized upon this and other inconsistencies as material inconsistencies proving Petitioner not credible. Ultimately, the Board affirmed the credibility determination and dismissed the appeal.

II.    Discussion

A.    Standard of Review

An applicant for withholding of removal or relief under CAT is entitled to a fair hearing under the Due Process Clause of the Fifth Amendment of the United States Constitution. Reno v. Flores, 507 U.S. 292, 306 (1993); Al Khouri v. Ashcroft, 362 F.3d 461, 464 (8th Cir. 2004) ("The Fifth Amendment's due process clause mandates that removal hearings be fundamentally fair."). For a removal hearing to be fair, the

arbiter presiding over the hearing must be neutral and the immigrant must be given the opportunity to fairly present evidence, offer arguments, and develop the record. 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(a)(4); Al Khouri, 362 F.3d at 465 ("[C]urtailing . . . testimony and circumscribing [a petitioner's] ability to elaborate on the details of his claim by instructing him only to answer the questions asked and then concluding that . . . limited responses undermined . . . his credibility violates notions of fundamental fairness."); Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." ). A neutral arbiter is, at a minimum, one who has not pre-decided the case and who is not predisposed to disregard a witness's testimony based on that witness's participation in an advocacy group. See, e.g., Lopez-Umanzor v. Gonzales, 405 F.3d 1049, 1056 (9th Cir. 2005) (finding a due process violation where an IJ appeared to have pre-decided a case and refused "to hear relevant testimony because of a prejudgment about the witness's 'credibility [and] the probative value of [the witness's] testimony'") (quoting Kaur v. Ashcroft, 388 F.3d 734, 737 (9th Cir. 2004)).

These procedural rights would be meaningless if an immigrant could not understand the proceedings, so the BIA recognizes that due process rights necessarily encompass the right to competent translation. Matter of Tomas, 19 I&N Dec. 464, 465 (BIA 1987). Also, although the "traditional rules of evidence do not apply in immigration proceedings," Prawira v. Gonzales, 405 F.3d 661, 663 (8th Cir. 2005), due process concerns dictate that immigration judges do not enjoy complete discretion in the admission and exclusion of evidence. Id.; see also Maroon v. INS, 364 F.2d 982, 986 (8th Cir. 1966) ("[T]he exacting requirements of judicial admissibility are not ordinarily applicable to administrative proceedings, except to the extent that due process is involved.") (internal citation omitted). To comport with the requirements of due process, evidence must be "'probative and its admission . . . fundamentally fair,'" Nyama v. Ashcroft, 357 F.3d 812, 816 (8th Cir. 2004) (quoting Espinoza v.

INS, 45 F.3d 308, 310 (9th Cir. 1995)), and the immigration court cannot unfairly prevent a petitioner from presenting probative evidence and making a record.

To be entitled to relief based on an alleged due process violation, a petitioner under the immigration laws must show prejudice. In this context, prejudice means a showing that the outcome of the proceeding may well have been different had there not been any procedural irregularities. United States v. Torres-Sanchez, 68 F.3d 227, 230 (8th Cir. 1995) ("Actual prejudice exists where defects in the deportation proceedings *may well have* resulted in a deportation that would not otherwise have occurred.") (emphasis added, internal quotations omitted). This standard does not require petitioners to show by a preponderance that, but for the procedural infirmities, the result of the proceedings would have been different. Al Khouri, 362 F.3d at 466 ("Prejudice in this context, however, does not require 'but for' causation."). Rather, petitioners must demonstrate an error that "'potentially . . . affects the outcome,'" id. (quoting Agyeman v. INS, 296 F.3d 871, 884 (9th Cir. 2002)), or "'had the potential for affecting' the outcome." Al Khouri, 362 F.3d at 466 (quoting Ambati v. Reno, 233 F.3d 1054, 1061 (7th Cir. 2000)).

Here, given the strength of Dr. Frye's report and testimony as well as the importance of her medical opinion to the corroboration of Petitioner's claims of physical abuse and torture, we hold that the exclusion of her testimony "may well have" affected the outcome, especially when coupled with the IJ's exclusion of other evidence and reliance upon infirm translation. Torres-Sanchez, 68 F.3d at 230. These combined errors include not only the exclusion of Dr. Frye's clearly admissible and highly probative testimony and report, but the exclusion of Professor Steinberg's corroborating report, the IJ's and the Board's reliance on unreliable translation, and the application of a far-too-exacting standard in assessing consistency between the application, the amended application, and the testimony. In particular, the IJ and the Board focused primarily on Petitioner's failure to maintain consistency in the details and level of detail used to describe his abuse and the locations and times of that abuse

during his incarceration at three different facilities.  The IJ and the Board also focused on Petitioner's description of difficulties with the mail and obtaining documents. These issues relate directly to the excluded evidence and to some of the most confusing aspects of the infirm translations.  We discuss the errors below and detail the prejudicial impact associated with each.

      B.      Exclusion of Experts

            1.      Dr. Frye

As an initial matter, we note that our review of the transcript left us with the firm impression that the IJ's desire to help the translator make a six o'clock flight weighed substantially in the decision to exclude Dr. Frye.  This is an obviously improper factor to consider when assessing the admissibility of an expert.  The IJ did not, however, expressly rely on this fact, and our analysis need not focus on this apparent basis for rejecting Dr. Frye.  Rather, we look to Dr. Frye's qualifications and the reasons for exclusion expressly stated by the IJ.

Among the express reasons given by the IJ for the exclusion of Dr. Frye were (1) her lack of travel to Burma, (2) her membership and work for the human rights organization, (3) her focus on internal medicine and infectious diseases rather than trauma, and (4) her lack of specialization in psychiatry or psychology.  Whether she had ever traveled to Burma has absolutely no bearing on her ability as a physician to recognize physical or psychological trauma or to comment regarding the consistency between Petitioner's actual, present physical symptoms and his claims of abuse and torture.  Further, we find it more than a little troubling that an immigration judge who is ostensibly working as a neutral arbiter in a fact-finding and decisionmaking capacity would use a physician's participation in an advocacy and aid organization as a basis to presume a conflict and bias (as opposed to considering such participation as affecting the weight of the evidence).  This is especially troubling where, as here,

the immigration service itself has used the very same organization to give presentations to immigration judges during training and continuing education seminars regarding torture.[3]  In our view, the IJ's assessment of Dr. Frye contained commentary regarding participation with the human rights organization that suggests the IJ may not have acted as a neutral arbiter.  Cf. Bensilmane v. Gonzales, 430 F.3d 828, 829 (7th Cir. 2005) (collecting cases involving suspect rulings by immigration judges); Wang v. Attorney General, 423 F.3d 260, 269 (3rd Cir. 2005) ("The tone, the tenor, the disparagement, and the sarcasm of the IJ seem more appropriate to a court television show than a federal court proceeding.").

Further, Dr. Frye was clearly qualified and offered critical corroborating testimony based on a recent medical examination of the Petitioner.  There does not appear to have been any objection to her methodology, only to her qualifications, and even if the Rules of Evidence were to apply in this context, it is not necessary that a physician be a specialist or publish in a particular area to provide assistance in the evaluation of claims of abuse or torture.   See Fed. R. Evid. 702 (requiring only that an expert be qualified "by knowledge, skill, experience, training, or education"). Given Dr. Frye's medical education and work experience as a physician and nurse in the United States and abroad, she was qualified to comment on physical trauma, physical scars, the consistency between Petitioner's claims and his physical scars and symptoms, and, based on her experience with trauma victims, psychological effects of trauma.  See, e.g., Hanaj v. Gonzales, 446 F.3d 694, 696, 700 (7th Cir. 2006) (ordering a remand and suggesting reassignment to a different IJ where the initial IJ

---

[3]The government does not contest assertions contained in the administrative record that immigration courts in over twenty-five states have accepted affidavits from physicians working for Physicians for Human Rights and that guidelines prepared by Physicians for Human Rights were included in the conference materials  for the Immigration Judges Annual Conference in 2001.  In fact, the administrative record contains materials from that conference demonstrating that Physicians for Human Rights presented to the immigration judges a program entitled "Evaluating the Physical and Psychological Scars of Torture."

ignored aspects of a petitioner's evidence, including an affidavit from a board certified family physician "who documented scars on [the petitioner's] heel, head, shoulder, back, palms and leg consistent with [the petitioner's] allegations of . . . beatings").

Regarding the possibility of prejudice under the standard of Torres-Sanchez, we believe that the exclusion of Dr. Frye's report and testimony may have affected the outcome of the proceedings. The contents of her report and anticipated testimony were strong evidence of torture and strongly corroborated Petitioner's claims. The markings around Petitioner's waist and ankles were consistent with his claims of having been shackled in the work camp, and his numerous small scars and skin discolorations were consistent with his claims of having been tortured with electrical shocks. The IJ and the Board, however, chose to wholly disbelieve Petitioner by focusing only on perceived conflicts between the applications, affidavit, and testimony regarding the details of when and where the abuse occurred. It is clear the IJ wholly disbelieved Petitioner because the IJ stated, "[t]he horrific facts Tun describes, if true, surely amount to past persecution."

Notwithstanding this conclusion, the IJ and the Board completely ignored the most valuable corroborating evidence of his torture—his scars—and relied specifically on infirm aspects of the translation to discount his claims. Petitioner's claim for relief, however, depended not on the precise details of when, how often, and in which place of confinement he was tortured, but whether he was tortured and whether it is likely to happen again upon his return to Burma. The inconsistencies relied upon by the IJ and the Board pale in comparison to the strong physical evidence corroborating his claims of torture, forced labor, and bondage. Given this fact, we have little trouble concluding that the improper exclusion of Dr. Frye's affidavit and testimony strongly suggest prejudice under the due process standard.

2.     Professor Steinberg

Professor Steinberg was qualified as shown not only by his resume, but also by his body of published works.  According to his affidavit, prepared in January 2004, he traveled frequently to Burma, including a recent visit in August 2003 and a planned trip in February 2004.  The IJ excluded his affidavit solely because he was not present to be cross examined.  The presence of the author of a report and availability of the author for cross-examination, however, are not absolute requirements in immigration proceedings.  See, e.g., Yang v. Gonzales, 427 F.3d 1117, 1121-22 (8th Cir. 2005) (finding error and remanding where an IJ and the BIA failed to accord weight to an affidavit from a non-testifying, facially qualified country condition expert).  As described above, fairness rather than the rules of evidence govern the admissibility of evidence, and the use of a report from a qualified witness, in the absence of any specific objections, is generally fair.  The weight IJ's routinely ascribe to reports by absentee authors is shown by reliance on such materials, including the State Department's country reports.  Perinpanathan v. INS, 310 F.3d 594, 599 n.1 (8th Cir. 2002) (discussing the value of Department of State country condition reports in the assessment of claimed fears of persecution).  Importantly, the government and the IJ in the present case did not suggest that there was any basis upon which to impugn Professor Steinberg's qualifications or to suspect bias.  Had the government suggested any basis for its alleged need to cross-examine Professor Steinberg, this issue might merit greater attention.  As it stands, however, the IJ's election to exclude the report of a facially unobjectionable expert without any explanation as to why cross-examination was needed is unfair and unsupportable.  See, e.g., Niam v. Ashcroft, 354 F.3d 652, 660 (7th Cir. 2004) (holding in an asylum case that the exclusion of a relevant expert witness's affidavit was arbitrary and required reversal where "nothing in [the expert's affidavit] or in her curriculum vitae showed that she was unqualified to give expert evidence").

Regarding prejudice, we note that Professor Steinberg's report provided strong corroboration for Petitioner's claims the military regime in Burma conducted surveillance of individuals, mail, and telephone conversations. These claims were also corroborated by statements in the country reports, but Professor Steinberg's report added detail and explained with greater specificity the invasive and pervasive nature of the regime's surveillance practices.[4] The exclusion of his report added to the prejudice against Petitioner because one of the primary bases for finding Petitioner not credible was Petitioner's perceived waffling regarding his family's and his friends' ability or inability to use the Burmese postal system and DHL shipping. Petitioner said that use of the mail was too dangerous and that government agents would read the mail, but he also said DHL packages were less likely to be screened and his family could use the mail system if they paid bribes to the appropriate persons. While it is

---

[4]Professor Steinberg wrote:

Based upon my travels to the country and my contacts there, I have no doubt that nearly all international correspondence is screened, international communications are tapped, and when I am there, I am often followed. My telephone conversations are intercepted, sometimes intelligence staff arrives at my appointments before I do. My taxis are often followed. Indeed, the United States Department of State reports that the Burmese security officials tightly screen all correspondence in and out of Burma, be it of a telephonic or written nature.

Given the foregoing, I believe that family members of political dissidents and former political prisoners who attempt to obtain prison records would be, at a minimum, detained and interrogated. The military government keeps a close watch over all aspects of the society, and fear is pervasive. Similarly, anyone who attempts to send out of Burma any correspondence of a political nature, such as police or prison records, political party documentation, or affidavits describing the reasons why such documents cannot be safely obtained in Burma, would place themselves in jeopardy and, if apprehended, would be at a minimum subject to interrogation by agents of the Burmese government.

-24-

not unreasonable for a finder of fact to view these statements as inconsistent and rely on such inconsistencies, in part, to find a petitioner not credible, our review for prejudice under the due process argument is not so deferential to the administrative findings. Al Khouri, 362 F.2d at 466. We do not ask whether a reasonable fact finder could agree with the IJ, rather, we ask whether the procedural errors may have affected the outcome. Id. The details added by Professor Steinberg demonstrate that communication is possible but risky and support Petitioner's claims regarding a limited ability to obtain documents and letters due to danger inherent in sending such materials from Burma. This additional corroboration was important to Petitioner's claims.[5]

C.    Interpretation Errors / Standards Regarding Consistency

We are also troubled by the lack of consideration given by the IJ and the Board to the issue of alleged translation errors in this case. Common sense informs us that evidence of improper translation may include direct evidence of mistranslated words, evidence that a witness is unable to understand a translator, or unresponsive answers from a witness. See, e.g., Perez-Lastor v. INS, 208 F.3d 773, 778 (9th Cir. 2000) (listing forms of evidence useful in identifying translation errors). Here all three indicia of erroneous translation were present. Of course, isolated instances of translation errors are not generally a basis for relief if "[t]he transcript of [a petitioner's] testimony as a whole [is] understandable and coherent, and thus [the petitioner is] able to convey her story to the IJ." Meas v. Ashcroft, 363 F.3d 729, 730 (8th Cir. 2004). It remains necessary, however, to ensure testimony is coherent before dismissing allegations of infirm translation. It is also necessary to gauge the

---

[5]We do not intend our opinion to stand for the proposition that the exclusion of an arguably redundant, corroborating report could, standing alone, give rise to a due process violation. Regarding Professor Steinberg's report, we hold only that exclusion was improper and added to the overall prejudice caused by the combined errors in this case.

possibility of prejudice in light of any other errors that may have occurred and in relation to whether the IJ or the Board relied upon erroneous portions of the translation in reaching their decisions. Here, we believe the evidence of erroneous translation, reliance by the Board and IJ on allegedly erroneous portions of the translation, and focus by the Board and IJ on minutia in the effort to find inconsistencies added to the overall prejudice against Petitioner.

Looking specifically at some of the issues noted by the IJ and the Board, the IJ stated that Petitioner's testimony was largely consistent with his affidavit as to torture at Tauck Kyant, but that Petitioner failed to recite in his testimony every detail regarding abuse and conditions of confinement as set forth in his affidavit. This standard, applied by the IJ, was too exacting. It is simply not necessary for a petitioner to precisely recite the contents of an affidavit verbatim in his testimony. See Bellido v. Ashcroft, 367 F.3d 840, 843-44 (8th Cir. 2004) (stating that the omission of details does not necessarily undermine the entirety of a petitioner's testimony).

Further, the IJ noted that Petitioner testified that he was not mistreated at Insein prison but shortly thereafter corrected himself to say that he was tortured at Insein prison. Also, Petitioner said in his affidavit he was raped at Tauck Kyant, the military headquarters, but in his testimony, he said he was raped at Insein before he corrected himself to say he was raped at Tauck Kyant. We find sufficient confusion surrounding these statements to make any reliance on this alleged inconsistency unfair. This was one of the most confusing aspects of the hearing and was obviously riddled with translation problems. While the IJ and the Board both recognized that there was some confusion in the translation as to the issue of times and locations of torture, their opinions treated the confusion as having been wholly clarified. For example, the interpreter appeared to have interchanged the words "raped," "mistreated," and "tortured like before." The Board determined that these errors had no impact because the interpreter relayed an answer provided by Petitioner as "No, I

was not mistreated while at Insein." This, however, ignores the fact that the flawed interpretation works in two directions—if the interpreter was using different words interchangeably when speaking to Petitioner, we can have no confidence that the answers relayed by the interpreter to the IJ and the attorneys accurately reflected what the Petitioner answered.

Also, the IJ said it was inconsistent for Petitioner to state he could not obtain documents from the Burmese government, but to have a copy of the arrest warrant to present at his hearing. Petitioner clearly explained, however, that the arrest warrant was delivered to his family—no family member had to seek this document from the Burmese government. The IJ also stated that it was inconsistent that Petitioner could obtain a passport given the fact that there was a warrant for his arrest. This statement merely demonstrates that the IJ ignored or missed the fact that the warrant was not issued until 1998, after Petitioner had already left the country.

The Board discussed numerous other instances of alleged inconsistencies. First, in the affidavit, Petitioner said he was beaten at Insein with batons, but in the testimony, he said he was hit with a stick, rifle butts, and military boots. We believe it is self-evident that the terms baton and stick are sufficiently similar to permit the use these two terms interchangeably without giving rise to an adverse credibility determination. Also, the omission of a reference to rifle butts and boots is inconsequential in light of the overall evidence in this case.

Also in the affidavit, Petitioner described the severe injury of not being able to walk, sit down, eat solid food, or go to the bathroom and of suffering severe abdominal pain after torture at Tauck Kyant, but in his testimony, he only made general reference to injury in his back ,shoulders, eyes, and head. The Board seized on this apparent discrepancy to support the finding of non-credibility. The Board failed to recognize, however, that the specific references were to injuries immediately after the beatings and sodomy. The general references to aches and pains, on the other

-27-

hand, were entirely consistent with Petitioner's claim regarding his lingering health effects and his present state of health as described by Dr. Frye.

Petitioner correctly notes that the numerous instances of difficulties in understanding the interpreter and Petitioner's arguably unresponsive answers lent an air of evasiveness and confusion to the proceedings. It is not possible to mathematically weigh the impact this impression or tone may have had on the IJ, and we do not mean to suggest that we believe Petitioner's testimony was without inconsistencies or that we believe Petitioner necessarily should have been found entirely credible. We also do not suggest that it would be proper to reverse the administrative decision under the highly deferential standard for direct review as set forth in INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992) and 8 U.S.C.A. § 1252(b)(4)(B). There remain numerous inconsistencies that do not appear to have been fully addressed by Petitioner and that might support a ruling against Petitioner. We hold only that the combined errors in this case were sufficiently pervasive that we must conclude they may have had an affect on the outcome. The excluded evidence provided strong support for Petitioner's claims, was closely related to the matters found dispositive by the Board, and involved matters that were the subject of the questionable translation.

III.    Conclusion.

Based on the foregoing, remand is required. On remand, proper consideration must be given to the medical evidence, focus should not be on trivial details to the exclusion of strong evidence of abuse, and steps should be taken to ensure adequate translation. We grant the petition for review, vacate the decision of the Board and remand for further proceedings.

————————————————