# United States Court of Appeals

## For the Eighth Circuit

No. 21-1800

_____

Carine Fuatabreh Adongafac

*Petitioner*

v.

Merrick B. Garland, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: June 15, 2022
Filed: November 21, 2022

_____

Before LOKEN and KELLY, Circuit Judges, and MENENDEZ, District Judge.[*]

_____

LOKEN, Circuit Judge.

The Department of Homeland Security commenced removal proceedings after Carine Fautabreh Adongafac, a citizen of Cameroon, entered the United States on November 30, 2019, in Laredo, Texas. She conceded removability and applied for

_____

[*]The Honorable Katherine M. Menendez, United States District Judge for the District of Minnesota, sitting by designation.

asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Following a hearing, the Immigration Judge (IJ) denied her application, finding that she failed to establish past persecution or a well-founded fear of future persecution. The Board of Immigration Appeals (BIA) dismissed Ms. Adongafac's appeal in a four-page opinion. She now petitions for judicial review of the final order of removal. The BIA's decision is the final agency action we review; we review the IJ's decision "to the extent that the BIA adopted the findings or reasoning of the IJ." Barrera Arreguin v. Garland, 29 F.4th 1010, 1015 (8th Cir. 2022) (quotation omitted).

Ms. Adongafac raises three issues on appeal. She first argues the BIA improperly applied Fifth Circuit instead of Eighth Circuit law in denying her application. Ms. Adongafac was in Louisiana during her asylum hearing, conducted by video conference, but the case was docketed in Minnesota. Venue is proper "where the administrative hearings were completed." Llapa-Sinchi v. Mukasey, 520 F.3d 897, 901 (8th Cir. 2008) (citation omitted); see Matter of R-C-R-, 28 I. & N. Dec. 74, 74 n.1 (B.I.A. 2020). Thus, Minnesota appears to be the proper venue. But Ms. Adongafac's appeal to the BIA did not argue the IJ erred in applying Fifth Circuit law, so failure to exhaust deprives us of jurisdiction to consider that issue. See Molina v. Whitaker, 910 F.3d 1056, 1061 (8th Cir. 2018), citing 8 U.S.C. § 1252(d)(1). Moreover, Ms. Adongafac fails to identify how Eighth Circuit law differs from the Fifth Circuit authorities cited by the IJ and the BIA, so any error by the BIA is harmless. The government's brief to our court relied on Eighth Circuit precedents, as will we.

Ms. Adongafac's other two asylum issues require careful review.[1] She argues (i) the BIA erred in upholding the IJ's ruling that she failed to provide reasonably obtainable evidence corroborating her otherwise credible testimony, see 8 U.S.C. § 1158(b)(1)(B)(ii); 8 C.F.R. § 1208.13(a); and (ii) the IJ and the BIA erred in finding that she did not demonstrate a well-founded fear of future persecution based on a pattern and practice of persecuting similar persons.

To be eligible for asylum, Ms. Adongafac must prove that she is a "refugee," 8 U.S.C. § 1158(b)(1)(A), meaning that she is unwilling or unable to return to Cameroon "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. 1101(a)(42)(A). Ms. Adongafac claims that she was subjected to past persecution in Cameroon and has a well-founded fear of future persecution because she is an Anglophone -- that is, an English speaker -- and because the Cameroon government and military impute to her a political opinion, support of those engaging in "Separatist" activities. We review "the ultimate question of past persecution or well-founded fear of future persecution, as well as the findings underlying that determination . . . under the substantial evidence standard that applies to agency findings of fact." Barrera Arreguin, 29 F.4th 1010 at 1015 (quotation omitted). To obtain reversal of the BIA's determinations, Ms. Adongafac "must show that the evidence [s]he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." I.N.S. v. Elias-Zacarias, 502 U.S.

---

[1]Ms. Adongafac does not separately challenge the denial of withholding of removal and relief under the CAT. The asylum officer who conducted her credible fear interview found that she was not eligible for asylum because she transited through at least one other country before entering the United States and did not apply for protection from persecution or torture. See 8 C.F.R. § 1208.13(c)(4)(i). The IJ questioned Ms. Adongafac about her extended travels before entering the United States but did not address this issue.

478, 483-84 (1992); see 8 U.S.C. § 1252(b)(4)(B).  Applying this highly deferential standard, we deny the petition for review.

## I. The Hearing Evidence

Ms. Adongafac was the only person who testified at the February 24, 2020 asylum hearing.  She identified herself as an Anglophone who lived in the village of Muyuka in the Southwest Region of Cameroon.  According to the November 7, 2019 online edition of *The Economist* (part of Exhibit 4 in the Certified Administrative Record),[2] after the First World War, Britain and France took over different parts of the German colony of Cameroon.  Upon independence in 1961, the larger French territory joined the southern part of the British colony to form modern Cameroon.  In 2016, *The Economist* reported, Anglophone Separatists in the smaller Northwest and Southwest Regions, claiming decades of "marginalisation," declared independence from Cameroon.  The French-dominated government hit back, beginning a still-ongoing violent conflict between the Separatists and the Cameroonian military, a conflict referred to as the "Anglophone crisis."  Hundreds of thousands of people have been forced to leave their homes.  Tens of thousands have fled to Nigeria, "but most are in the bush."  *The Economist* reported that both sides "share some of the blame" for the violence and chaos.

Ms. Adongafac testified that she operated a restaurant in Muyuka.  On April 27, 2019, she heard gunshots outside in the street.  One customer went out to investigate.  He was shot and killed.  Cameroonian military officers entered the restaurant, demanding to know if anyone knew the man who had been shot.  The officers ordered everyone on the ground.  They pushed Ms. Adongafac over and

---

[2]"A War of Words," *The Economist* (Nov. 7, 2019), found at https://www.economist.com/middle-east-and-africa/2019/11/07/english-speaking-villages-are-burning-in-cameroon.

-4-

kicked her, then asked if she knew the man or the location of "his friends," claiming they were Separatist fighters.  Ms. Adongafac said she knew nothing about him.  The officers ordered the eight people in the restaurant to walk to a military truck parked outside.  Ms. Adongafac was pushed onto the truck and taken to "public security in Mallorca," where the military took her name and address and threw her in a cell.

Ms. Adongafac related that she was held in a cell for ten days with some twenty other people.  They were forced to sleep on the floor, given only a banana to eat every day, and had to use a bucket in the corner as a bathroom.  Officers interrogated Ms. Adongafac ten times over five days about the man who was shot outside her restaurant.  Though never politically active, she stated they thought she was a Separatist because she is an Anglophone and Separatists ate at her restaurant.  They kicked her, whipped her with belts and batons, pushed her head into the bathroom bucket, and called her a separatist and "Anglo fool."  On the tenth night of detention, one officer forced her to undress and raped her at gunpoint, causing her to bleed and eventually pass out.  She testified she was two months pregnant and believed the bleeding was from having a miscarriage.

Ms. Adongafac woke up in the local district hospital where she spent five days "guarded by a village man."  On the fifth day, her Uncle came to the hospital and told her to come with him, telling her not to worry about the guard, who was not at his post.  She was taken to the home of her friend, who cared for her for nine days.  Her Uncle then brought her 2018 passport, an ID, money, and a Turkish airline ticket to Ecuador.  He told her the military had come to her house looking for her and beaten her husband and daughter; she needed to flee the country.  She went to the airport in Douala with her Uncle and boarded the plane to Ecuador with the help of an immigration official.  Her direct testimony concluded:

> [Counsel]:  What do you believe would happen if you returned to Cameroon?

Ms. Adongafac [to counsel]: I will be rearrested, detained, tortured, raped again. I'll probably be killed because official[s] accused me of feeding the Separatist fighters and that will happen because I am an Anglophone. And I had escaped from prison. I escaped from the hospital. I was not released legally.

In response to questions from the IJ, Ms. Adongafac testified that she escaped from the hospital without her medical records and had no medical treatment after leaving the hospital. No one requested her records "because it's a government hospital." She has no photos of her injuries. Her Uncle arranged her travel to Ecuador. "It was his plan. He just surprise[d] me with it." On arriving, her plan was to hide in Ecuador for some time, "but the situation there was not favorable." She further testified on cross examination that she did not attempt to contact her husband or her daughter before leaving Cameroon. She told her Uncle she needed to see them before leaving; he said he did not know where they were.

Ms. Adongafac told the credible fear interviewer that, from Ecuador, her Uncle arranged for her to travel through Columbia, Panama, Costa Rica, Nicaragua, Honduras, Guatemala, and Mexico to reach the United States. At the hearing, she testified that her passport and a cell phone that she acquired in Mexico were stolen in Mexico, but she did not report the incident. She did not attempt to contact anyone in her family with that cell phone and has not spoken to any family in Cameroon since leaving. She knows her daughter is with her older sister in Cameroon but does not know where her husband is.

Following the hearing, Ms. Adongafac submitted several documents to support her testimony including: her declaration dated July 7, 2020; declarations of her Uncle dated July 17, 2020, her friend dated July 20, 2020, and two of her sisters, one who remains in Cameroon and the other who lives in Maryland, dated July 7 and 8, 2020; mental health notes; declarations from two mental health professionals addressing Ms. Adongafac's claims of mental health issues while in detention in the United

States; and what Ms. Adongafac labels "Country Conditions Evidence" -- four news articles and two Human Rights Watch reports describing violence and atrocities committed during Cameroon's Anglophone crisis.

## II. The Decisions under Review

Based on "the totality of the circumstances presented," the IJ "reluctantly" found that Ms. Adongafac "testified credibly with respect to the matters before it." However, while her testimony was consistent with prior statements, including the credible fear interview, it was "so consistent, regularly using . . . indicia of having been memorized . . . that it does not appear to this Court that many of the details provided, to the limited extent that there were details provided, arose from personal experiences of [Ms. Adongafac]." When the IJ or DHS counsel "attempted to elicit any detail outside the parameters of the limited detail provided . . . [Ms. Adongafac] stumbled, faltered, and essentially was unable to provide any other detail." Accordingly, the IJ made a positive credibility finding but found that her credible testimony "is weak" and therefore the testimony alone was "not sufficiently detailed" to support Ms. Adongafac's burden of proof and "require[d] corroboration."

The IJ expressly considered all of the evidence and testimony "regardless of whether specifically mentioned." The IJ found that Ms. Adongafac "failed to submit corroborative evidence in the form of any medical records or any objective evidence with respect to the physical injuries . . . that she stated were inflicted upon her because she was an Anglophone and [her] imputed support of the Separatists." She did submit numerous statements from family members and friends in support of her application for relief. But those statements "lack sufficient detail [and] most if not the majority of the information within those statements was not based upon personal knowledge of the facts stated. . . . [N]one of the individuals who provided statements provide any specific details concerning their observations of [Ms. Adongafac], including her Uncle and her friend." The IJ observed that no efforts were made to

obtain medical records and that her injuries required no further treatment after she left the hospital.

Because she did not sufficiently corroborate her injuries, the IJ found that Ms. Adongafac had not met her burden of demonstrating past persecution. The IJ further found that Ms. Adongafac had likewise failed to establish a well-founded fear of future persecution. She "has not presented sufficient evidence to demonstrate that any government official in Cameroon, including the military, has searched for her, or continues to search for her, thus making her fear of return there objectively reasonable." To the contrary, the IJ explained, Ms. Adongafac testified that when under guard at the hospital, the military "looked the other way when she, accompanied by her Uncle, simply walked out of the hospital into a waiting car and traveled to a nearby home of a friend where she stayed for several days before being able to leave without being impeded by any member of the military using her identification and a passport, and a ticket in her name." Nor did Ms. Adongafac establish "there is a pattern or practice of persecution of a group of persons similarly situated to her on account of a protected ground . . . such that her fear of persecution upon return is reasonable."

In dismissing Ms. Adongafac's administrative appeal, the BIA discussed in detail her claims of adequate corroborating evidence and concluded:

> Based on the foregoing, [Ms. Adongafac] did not adequately corroborate her claim with reasonably available evidence, and the portion of her asylum claim based on her imputed political opinion fails on this basis. We also affirm the [IJ's] determination that [Ms. Adongafac] did not demonstrate a pattern or practice of persecution against Anglophone separatists because [she] did not establish that her fear of persecution is reasonable. These are dispositive issues, and we need not address [Ms. Adongafac's] other arguments on appeal relating to her asylum claim.

### III. Discussion

**A. An Evidentiary Issue.** Ms. Adongafac first contends that the BIA "committed legal error in affirming the [IJ's] denial of relief without considering all corroborative evidence," namely, a declaration from her sister in Maryland that was in the administrative record, and "the extensive articles and reports that Ms. Adongafac submitted regarding the country conditions in Cameroon." An alien seeking asylum has a due process right to a fair hearing in removal proceedings and "must be given the opportunity to fairly present evidence, offer arguments, and develop the record." Tun v. Gonzalez, 485 F.3d 1014, 1025 (8th Cir. 2007); see 8 U.S.C. § 1229a(b)(4)(B). But on this administrative record, we conclude the contention is without merit.

Regarding the sister's declaration, the IJ questioned Ms. Adongafac's testimony that she had no plan to come to the United States when she left Cameroon, noting she made an inconsistent statement to the asylum officer. But the IJ could not further examine the issue because "the Court does not have an affidavit from that sister." The BIA noted on appeal that the sister's declaration was in the record but "deem[ed] this mistake harmless error." We note that the IJ may not even have made a "mistake" because there is some difference between a declaration sworn "under penalty of perjury" and an affidavit subscribed and sworn to in the presence of a notary public. But in any event, the sister's declaration did not address Ms. Adongafac's inconsistent statements that concerned the IJ, and the declaration falls squarely within what the IJ referred to as "numerous statements . . . from family members [that] lack sufficient detail [and were] not based upon personal knowledge of the facts stated." The IJ is entitled to a "presumption of regularity" and need not "mention every piece of evidence that it considered." Doe v. Holder, 651 F.3d 824, 831 (8th Cir. 2011). Here, the BIA addressed this issue. It did not abuse its discretion "by wholly failing to consider evidence [Ms. Adongafac] presented." Kanagu v. Holder, 781 F.3d 912, 918 (8th Cir. 2015).

Regarding Ms. Adongafac's "country conditions" evidence, she did not submit United States Department of State country reports that we have found significant in asylum cases such as Tegegn v. Holder, 702 F.3d 1142, 1146-47 (8th Cir. 2013). Rather, she submitted articles by journalists and Human Rights Watch reports describing the circumstances facing civilian victims on both sides of the Anglophone crisis. The IJ expressly stated she considered all the record evidence. The BIA did not err in concluding that this type of country conditions evidence did not establish the objective reasonableness of Ms. Adongafac's subjective fear of future persecution on account of her imputed political opinion or her Anglophone identity. See Njong v. Whitaker, 911 F.3d 919, 924 (8th Cir. 2018). Nor did these unofficial publications establish a "pattern or practice of persecution," which must be "systematic, pervasive, or organized." He v. Garland, 24 F.4th 1220, 1226 (8th Cir. 2022).

**B. The Merits.** Ms. Adongafac next argues the BIA erred in concluding that she failed to adequately corroborate her asylum claim. She argues she adequately established the lack of available medical records by credibly testifying that "nobody could have obtained the [medical] records from the hospital from which she *escaped*."

When the IJ "determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). The IJ may require supporting evidence "for material facts that are central to [an asylum] claim and are easily subject to verification." Matter of L-A-C-, 26 I. & N. Dec. 516, 519 (B.I.A. 2015). If supporting evidence is not produced, the petitioner must have an opportunity to explain its unavailability, ensuring the explanation is in the record. Id. at 521-22; see Barrera Arreguin, 29 F.4th at 1016. "[T]he REAL ID Act place[s] the burden on the petitioner to corroborate otherwise credible testimony." Uzodinma v. Barr, 951 F.3d 960, 967 (8th Cir. 2020), cert denied sub nom. Uzodinma v. Garland, 141 S. Ct. 2511 (2021). We

-10-

may not reverse the BIA's determination that corroborating evidence was available "unless a reasonable trier of fact would be compelled to conclude that the evidence is unavailable." Omondi v. Holder, 674 F.3d 793, 800 (8th Cir. 2012) (quotation omitted); accord Ntangsi v. Holder, 554 F.3d 1142, 1148 (8th Cir. 2009); Eta-Ndu v. Gonzales, 411 F.3d 977, 985-86 (8th Cir. 2005).

Here, Ms. Adongafac's asylum claim was based in large part on the alleged detention, beatings, and rape that Cameroonian military officers inflicted upon her following the shooting incident at her restaurant. Thus, when the IJ required corroborating evidence, the absence of medical records supporting hospitalization and treatment of those injuries was an important issue. The IJ found Ms. Adongafac's explanation for not providing medical records and other evidence corroborating her injuries "not persuasive":

> The Court has tak[en] into consideration [Ms. Adongafac's explanation]. However, the Court notes that Respondent [lacked] any information of any assistance to the Court concerning how multiple people appear to have been bribed by her Uncle to facilitate [her] exodus from the hospital . . . and facilitate[d] and procure[d] the unlawful and illegal conduct by Immigration officials and other individuals at the international airport in Douala, [yet] no efforts have been made to obtain any of those medical records . . . including by bribing someone at the hospital or facility.

Ms. Adongafac argues the IJ erred in finding her explanation unreasonable. We conclude that a reasonable trier of fact would not be *compelled* to agree. While her claim that no one requested her records "because it's a government hospital" is plausible, in that many cases have observed that a petitioner should not be required to provide corroboration "from the persecutor,"[3] the record only shows that the

---

[3]Gontcharova v. Ashcroft, 384 F.3d 873, 878 (7th Cir. 2004), quoting In re S-M-J-, 21 I. & N. Dec. 722, 725 (B.I.A. 1997).

facility was a "district hospital," not necessarily controlled by the military, and that Ms. Adongafac was able to walk away, allegedly because her Uncle had bribed a "guard" to leave his post while she did so. This hardly establishes that medical records of her injuries were not available at the hospital.

Moreover, the absence of medical records was only one reason the IJ gave for finding that Ms. Adongafac did not provide adequate corroborating evidence for weak testimony that she could not support with "any detail outside the parameters of the limited detail provided." There was no objective corroborating evidence regarding the other persons arrested with Ms. Adongafac at the restaurant; how her Uncle arranged her "escape" from the hospital and secured the help of a government official for her departure; whether she could have located her husband; whether she had no contact with her husband, daughter, and sister in Maryland before entering the United States; and the details of her apparently extensive travels en route to the United States. Ms. Adongafac's explanation for each of these evidentiary omissions, standing alone, was perhaps understandable. But the IJ and the BIA were required to look at the record as a whole. Applying the governing deferential standard of review, we will not reverse the BIA's ruling that the credible but weak testimony supporting her asylum claim was not adequately corroborated. We are not "compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4). Accordingly, Ms. Adongafac failed to establish her eligibility for asylum relief.

## III.  Conclusion

For the foregoing reasons, we deny the petition for review.

_____