**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1838**

TOBARAK ULLA TOFU,

          Petitioner,

    v.

MATTHEW G. WHITAKER, Acting Attorney General,

          Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 27, 2018                    Decided: November 21, 2018

Before GREGORY, Chief Judge, MOTZ, Circuit Judge, and William L. OSTEEN, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Petition denied by unpublished opinion. Judge Osteen wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

**ARGUED:** Vron John Kapoor, LAW OFFICE OF VRON JOHN KAPOOR, Washington, D.C., for Petitioner. Victoria Marie Braga, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, Cindy Ferrier, Assistant Director, Surell Brady, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

OSTEEN, JR., District Judge:

Tobarak Tofu ("Tofu"), a citizen of Bangladesh, has filed for asylum, withholding of removal, and protection pursuant to U.S. obligations under the United Nations Convention against Torture ("CAT"). Tofu alleges that he was persecuted in Bangladesh due to his political opinion and that he has a well-founded fear of future persecution on that same basis.

The immigration judge ("IJ") determined that Tofu was not credible due to five major discrepancies in his testimony, and the Board of Immigration Appeals ("BIA") affirmed on the same grounds. Because we find that three of these inconsistencies are valid reasons to doubt Tofu's credibility, we affirm the BIA's order and deny Tofu's petitions for asylum and withholding of removal.

We further find no merit in Tofu's argument that the IJ improperly took additional testimony on remand from the BIA. Finally, we conclude that the BIA's denial of CAT protection was supported by substantial evidence.

## I.

## A.

Tofu asserts that he has been involved with the Bangladesh Nationalist Party ("BNP") since 1987, acting as a local political organizer and recruiting villagers to attend

rallies. J.A. 439–41.[1] Tofu may also have been a member of the local "ward committee" of the BNP in his village. J.A. 101–02. Tofu testified before the IJ that he went door to door in the village publicizing BNP rallies. J.A. 440–42. The rallies were attended by approximately 2,500 to 3,000 people, and Tofu's role at the rallies was to maintain order and lead attendees in shouting slogans. J.A. 130.

Tofu alleges that he was twice the victim of violence perpetrated by members of the opposition political party, the Bangladesh Awami League ("Awami League"). On November 25, 1996, Tofu was attacked at a market by a group of ten to fifteen men wielding machetes and hockey sticks and was cut with a machete on his left arm. J.A. 431–32. Tofu testified that he recognized his attackers as local Awami League members. J.A. 433. The Awami League controlled Bangladesh at the time of the 1996 attack and remained in power until the BNP won the 2002 election. J.A. 122.

On March 15, 2009, shortly after the Awami League regained control over the Bangladeshi government from the BNP, ten to fifteen people associated with the Awami League attacked Tofu's tea store. J.A. 445. The attackers cursed Tofu, forced him to flee, and ransacked his store. J.A. 445–51; *but see* J.A. 103 (where Tofu stated that the attackers "bombed out" the store). According to Tofu, several of the individuals who attacked his store in 2009 also participated in the 1996 attack. J.A. 448.

---

[1] Citations herein to "J.A. _____" refer to the Joint Appendix filed by the parties in this matter.

4

Tofu stated in his credible fear interview that he reported the 1996 attack to police, who did not accept the case due to Awami League influence. J.A. 773. This statement is consistent with Tofu's oral testimony before the IJ regarding the 1996 attack. J.A. 444. In his credible fear interview, Tofu also stated that he did not personally report the 2009 attack because he feared retaliation. J.A. 774. However, Tofu asserted that he told his local Member of Parliament about the attack and that this individual filed a police report. J.A. 775. In his oral testimony before the IJ, Tofu stated only that "we went to the police station to file an incident, they did not accept our case"; Tofu did not specify whether this statement related to the 1996 or 2009 attack. J.A. 459.

In March 2009, following the attack on his store, Tofu left his native village in Bangladesh. J.A. 450–55. He stayed in Dhaka, the capital of Bangladesh, for several weeks before briefly returning to his village. *Id.* After traveling to India for a period of time,[2] Tofu returned to Bangladesh and applied for a passport and visa to the United Arab Emirates. J.A. 474–76. Tofu traveled to Dubai in October 2009 and then made his way to Guatemala and Mexico before crossing into the U.S. at Hidalgo, Texas, on June 13, 2010. J.A. 489–92.

---

[2] Tofu stated in his credible fear interview that he spent one month in Calcutta, India, around May 2009 and attempted to obtain a visa to remain in India. J.A. 775. However, Tofu testified before the IJ that he traveled to Gujarat, India (on the opposite side of the country from Calcutta), for ten to twelve days in June 2009. J.A. 483-86. Tofu further testified that he had either mistakenly referred to Calcutta in the credible fear interview or that his answer was recorded incorrectly. J.A. 485-86.

U.S. Immigration and Customs Enforcement agents apprehended Tofu and initiated removal proceedings. J.A. 594–95. An asylum officer conducted a credible fear interview of Tofu on June 28, 2010, and found that Tofu had a credible fear of persecution. J.A. 769–71. On June 8, 2011, Tofu submitted his asylum application. J.A. 576.

Tofu's wife, two children and other relatives remain in Bangladesh. J.A. 425–26. Tofu testified before the IJ that Awami League members came to his home on multiple occasions in 2012 looking for him, threatened to kill him, and "attacked [his] house." J.A. 456. He also testified that Awami League members have threatened his wife and children since Tofu left the country. J.A. 134–37, 635.

**B.**

Tofu testified before the IJ and submitted documentary evidence in support of his asylum application. J.A. 391 *et seq.* On February 23, 2013, the IJ issued an oral decision deeming Tofu not credible and denying his petition for asylum. J.A. 371. On December 12, 2014, the BIA issued a two-page decision remanding the claim to immigration court. J.A. 297–98. The BIA observed that the IJ gave improper weight to Tofu's demeanor and "failed to consider the respondent's corroborating documents" and remanded the matter with directions to "determine anew the respondent's eligibility for relief." *Id.*

On remand, the IJ took additional oral testimony from Tofu and further examined Tofu's documentary evidence. J.A. 91 *et seq.* On October 18, 2016, the IJ issued a detailed ruling that again found Tofu's testimony about past persecution not credible and deemed Tofu's corroborating evidence insufficient to rehabilitate his testimony or establish a well-founded fear of future persecution. J.A. 40–54. On June 19, 2017, the BIA affirmed this

6

decision and offered additional analysis of the IJ's findings. J.A. 3–6. Tofu now appeals from the final BIA order.

## II.

### A.

The Immigration and Nationality Act gives the Attorney General discretionary power "to grant asylum to aliens who qualify as 'refugees.'" *Dankam v. Gonzales*, 495 F.3d 113, 115 (4th Cir. 2007) (citing 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A); *INS v. Ventura*, 537 U.S. 12, 13 (2002) (per curiam)). To qualify for asylum, applicants have the burden of establishing they are unable or unwilling to return to their country of origin because of either past persecution or well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A).

An asylum applicant can establish eligibility by providing credible testimony about his or her experiences. *Ilunga v. Holder*, 777 F.3d 199, 206 (4th Cir. 2015) (citing 8 C.F.R. § 208.13(a)). The IJ must evaluate both the applicant's oral testimony as well as any corroborating evidence, and must give "specific cogent reasons for why it finds the testimony" and the documents not credible. *Kourouma v. Holder*, 588 F.3d 234, 241 (4th Cir. 2009). The REAL ID Act of 2005 requires IJs to determine credibility based on the totality of the circumstances and expressly directs the IJ to consider matters such as the applicant's demeanor, consistency between statements, internal consistency of testimony, and the plausibility of the applicant's account. 8 U.S.C. § 1158(b)(1)(B)(iii). The REAL

7

ID Act further states that any inconsistency need not go "to the heart of the applicant's claim" in order to be probative of credibility. *Id.*; *see also Djadjou v. Holder*, 662 F.3d 265, 274 n.1 (4th Cir. 2011) (describing the impact of the REAL ID Act on credibility determinations).

Persecution "involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition." *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (internal quotation marks omitted) (quoting *Kondakova v. Ashcroft*, 383 F.3d 792, 797 (8th Cir. 2004)). To qualify for asylum based on past persecution, the applicant must show that he was persecuted in his home country on account of membership in a protected group and is "unable or unwilling to return to, or avail himself . . . of the protection of, that country owing to such persecution." 8 C.F.R. § 208.13(b)(1). In order to prove a fear of future persecution, the applicant must show both a subjective element—"genuine fear of persecution"—and an objective element—"that a reasonable person in like circumstances would fear persecution." *Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010) (quoting *Chen v. INS*, 195 F.3d 198, 201 (4th Cir. 1999)).

To qualify for the separate remedy of withholding of removal under 8 U.S.C. § 1231(b)(3)(A), applicants must meet a higher burden. An alien seeking withholding of removal must show a "clear probability" that his or her life or freedom would be threatened in the country of origin. *Marynenka*, 592 F.3d at 600. Because withholding of removal imposes a higher burden on the applicant than asylum, an applicant who is denied asylum will automatically be ineligible for withholding of removal. *See Camara v. Ashcroft*, 378

F.3d 361, 367 (4th Cir. 2004) ("[A]n applicant who is ineligible for asylum is necessarily ineligible for withholding of removal . . . .").

An alien may also seek protection pursuant to U.S. obligations under the CAT. In order to qualify for CAT protection, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). However, the probability of torture "need not be tied to a protected ground." *Marynenka*, 592 F.3d at 600. "For purposes of the CAT, torture includes only conduct 'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (quoting 8 C.F.R. § 1208.18(a)(1)).

**B.**

When the BIA issues a final order affirming and adopting the IJ's decision, as it did here, we review both rulings. *Tang v. Lynch*, 840 F.3d 176, 179 (4th Cir. 2016). The final removal order is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). The BIA abuses its discretion only when it "fail[s] to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

We review factual findings, including findings about the credibility of oral testimony and the proper weight to accord documentary evidence, to ensure they are supported by substantial evidence, and we uphold factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Ilunga*, 777 F.3d at 206; *Lin v. Holder*, 736 F.3d 343, 351 (4th Cir. 2013) ("This

9

standard is very deferential, and does not permit a re-weighing of the evidence."). We review denial of CAT protection under the same substantial evidence standard. *Lizama*, 629 F.3d at 449.

We review any legal issues *de novo*. *Djadjou*, 662 F.3d at 273.

## III.

### A.

Tofu argues that the IJ improperly relied on minor inconsistencies in his testimony and discrepancies between testimony and corroborating evidence to find him not credible regarding his past persecution and fear of future persecution in Bangladesh. Specifically, Tofu takes issue with the following five inconsistencies identified by the IJ:

First, the IJ found that Tofu gave conflicting accounts of where he hid after fleeing from his attackers in March 2009. Tofu told the asylum officer who conducted his credible fear interview that he fled to and then stayed at a neighboring house. J.A. 773–74. Tofu later testified before the IJ that he ran into a garden and hid there until his attackers left. J.A. 445.

Second, Tofu testified that he received a deep cut on his left arm during the 1996 attack, which was treated by a village doctor. J.A. 434. Tofu also produced a letter purportedly written by the village doctor describing the wound and treatment. J.A. 160. However, this letter is dated May 20, 2009 and states that treatment was rendered on May 20, 2009. *Id.*

Third, the IJ found that Tofu's ability to travel unhindered after the 2009 attack and the fact that Tofu obtained an official passport and left Bangladesh legally cast doubt on Tofu's credibility. J.A. 47. Specifically, the IJ found that Tofu's travel history did not support his professed fear of future persecution by the Awami League. *Id.*

Fourth, the IJ determined that Tofu lacked familiarity with BNP political ideology and gave vague testimony about his involvement with the party. The IJ found that these weaknesses undermined Tofu's credibility, because they suggested that he was not as involved with the party as he claimed to be and would not be targeted in Bangladesh for his political activities. J.A. 46–47.

Fifth, the IJ found Tofu's testimony insufficient to establish that the Bangladeshi government was unable or unwilling to protect him from Awami League violence. J.A. 47. Tofu testified that the police were contacted after each attack, J.A. 444, 459, but Tofu did not provide documentary evidence proving that either he himself or other BNP members attempted to file reports.

**B.**

We find that three of the reasons cited by the IJ sufficiently support the adverse credibility finding. We find that the other two reasons are suspect, as explained below. Under the substantial evidence standard, we affirm the finding that Tofu was not credible.

Tofu's conflicting testimony about where he hid following the March 2009 attack cannot be explained by mere translation difficulties as Tofu's counsel urged at oral argument before this court. Tofu's oral testimony was the only firsthand account of the 2009 attack before the IJ. *Cf.* J.A. 556–57 (testimony from Mr. Mohammad Eusuf, who

11

heard that Tofu had been chased out of his store but did not personally witness the attack). Thus, it was appropriate for the IJ to use this discrepancy to determine credibility.

The inconsistency between Tofu's testimony about his 1996 injuries and the doctor's May 2009 letter is similarly material to Tofu's credibility. Because Tofu alleges only a single instance of physical harm, this issue is significant in the assessment of Tofu's credibility. While it is possible that the doctor simply dated the letter incorrectly, Tofu and his counsel were capable of reviewing and confirming the details in the first instance and seeking additional evidence as necessary. We further find it doubtful that the doctor accurately remembered details of an injury he treated over twelve years ago, and the letter makes no reference to records that may have refreshed the doctor's memory.

We find that Tofu's decision to travel to India and then return to Bangladesh was also material to his credibility. Tofu's return to Bangladesh from India prior to obtaining his Dubai visa is a key fact suggesting that Tofu did not have a well-founded fear of persecution at the hands of the Awami League. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 189 (4th Cir. 2004) (upholding BIA's conclusion that petitioner's voluntary return to his native country rebutted a presumption of well-founded fear of future persecution). Further, while there is no evidence that the Bangladeshi government was aware of Tofu's travels between India and Bangladesh, soon after returning to Bangladesh, Tofu availed himself of a government service by requesting and obtaining approval to leave the country. We note, however, that this fact alone does not necessarily undermine Tofu's credibility. To the contrary, a foreign government may be more than willing to allow troublesome political activists to leave the country. If these activists are able to prove the elements required for

12

asylum, the fact that the government acquiesced in their departure is not necessarily probative of the credible fear element of an asylum claim. *See Bah v. Ashcroft*, 107 F. App'x 810, 811 (9th Cir. 2004) (concluding that the IJ's finding that applicant would not "have been allowed to leave the country without difficulty if he was as politically active as he claimed" was conjecture and "not a proper basis for a negative credibility finding"). But "it is not our task to reweigh the evidence and determine which of the competing views is more compelling." *Ngarurih,* 371 F.3d at 189 (internal quotation marks omitted). Substantial evidence supports the IJ's finding that Tofu's willingness to return to Bangladesh was a key fact that undermined his credibility.

Two discrepancies cited by the IJ are not legitimate reasons to doubt Tofu's credibility. First, the IJ should not have relied on Tofu's apparent lack of knowledge about BNP political ideology in finding Tofu not credible. Tofu is not required to articulate an intimate knowledge of political doctrine in order to prove a credible fear of persecution; rather, he is only required to show persecution "on account of . . . political opinion." 8 U.S.C. § 1101(a)(42). Further, Tofu's low level of education provides a reasonable explanation for his inability to articulate the BNP's ideology. Tofu testified that he organized rallies, and other witnesses stated that Tofu was known in the area as a political activist. Tofu did not have to demonstrate familiarity with BNP political doctrine to make out an asylum claim.

Second, we are not convinced by the IJ's reasoning that, because Tofu was unable to produce a police report, he failed to show that Bangladeshi authorities were unwilling protect him. Tofu cannot be expected to provide a document that he did not receive,

13

apparently through no fault of his own, or to prove a negative. Therefore, the IJ should not have relied on the lack of a police report to find Tofu's testimony on the issue not credible.[3]

We find that three of the IJ's reasons for finding Tofu not credible—(1) the internal contradiction in Tofu's testimony about the aftermath of the 2009 attack, (2) the discrepancy between Tofu's oral testimony and the doctor's letter with regard to his 1996 injuries, and (3) his return to Bangladesh—are each a legitimate reason to question Tofu's credibility. We further find that these three reasons, viewed together, support an adverse credibility finding under this court's precedent. *See Camara*, 378 F.3d at 368–69 (affirming denial of asylum petition under the substantial evidence standard where only two of six discrepancies actually supported the IJ's credibility finding).[4]

## C.

When an asylum applicant's oral testimony is not credible, the IJ must still examine any corroborating documentary evidence to determine whether it rehabilitates the

---

[3] We do observe, however, that Tofu's statements and evidence lack specificity on this point because they fail to demonstrate both how Tofu's local Member of Parliament actually attempted to report the 2009 attack and how Tofu learned from this individual that the police were unwilling to help. As these issues were not raised by the IJ, BIA, or either party on appeal, we will not examine them in detail here. We simply note that a finding by this court one way or the other would not impact our decision.

[4] Although *Camara* was decided prior to the passage of the REAL ID Act of 2005, this does not change our analysis because the REAL ID Act broadened the scope of potential inconsistencies that might properly support an adverse credibility finding. *See Singh v. Holder*, 699 F.3d 321, 328–29 (4th Cir. 2012) (explaining that the REAL ID Act overruled the prior requirement that an inconsistency must go "to the heart of the . . . claim"; finding that the "credibility determination need no longer rest solely on those matters fundamental to an alien's claim for relief").

14

applicant's testimony and independently makes the applicant eligible for asylum. *Ilunga*, 777 F.3d at 213. Tofu argues that the IJ erred by improperly discounting his corroborating evidence.

Tofu's corroborating evidence consists of: (1) letters and affidavits from friends and family members, (2) letters from BNP leaders, (3) the doctor's letter regarding his 1996 injury, and (4) numerous country condition reports describing politically-motivated violence in Bangladesh. On remand, the IJ addressed this evidence and discounted its value for three significant reasons, J.A. 49–52, two of which we find sufficient. First, the IJ noted that the evidence was provided almost exclusively by interested friends and family members of Tofu. Second, documentary evidence was inconsistent with oral testimony regarding certain key events—in addition to the misdated doctor's letter, an affidavit from Tofu's father made no mention of the 2009 attack, at which he was allegedly present. *Compare* J.A. 639, *with* J.A. 448. Third, the IJ found that certain letters appeared to follow the same form and used similar language, casting doubt on their legitimacy.[5]

The IJ may discount documentary evidence from interested parties due to its source. *See Kourouma*, 588 F.3d at 241 (citation omitted) ("This Circuit requires that the evidence offered as corroborating evidence be objective . . . ."); *Djadjou*, 662 F.3d at 276 (citation omitted) ("Letters and affidavits from family and friends are not objective evidence in [the

---

[5] In reviewing these letters, we are not convinced that the IJ's reliance on "uncanny similarities" among the letters was proper—especially when those similarities are facts necessary to Tofu's asylum claim. J.A. 49. Nonetheless, because we find that the IJ's other two reasons for discounting the corroborating evidence were sufficient, we will not analyze the content of the letters further.

15

corroboration] context."). When documentary evidence is inconsistent with oral testimony, this casts doubt on the reliability of the evidence and constitutes a "specific, cogent reason[]" for discounting the evidence. *See Djadjou*, 662 F.3d at 276–77 (stating that documentary evidence must be reliable). We additionally note that Tofu did not submit any documentary evidence containing an eyewitness account of either the 1996 or the 2009 attack, the only two events supporting Tofu's claim of past persecution.

We find that both the IJ (responding to the BIA's explicit instructions on remand) and the BIA thoroughly analyzed Tofu's corroborating evidence and provided cogent reasons for discounting this evidence. We further conclude that these reasons are appropriate under our precedent. *See id.* Therefore, we affirm the ruling that the documentary evidence was insufficient to rehabilitate Tofu's testimony.

**D.**

Tofu urges us to find that the IJ improperly conducted an additional hearing and took oral testimony on remand. However, Tofu cites no specific authority for this argument. The BIA order remanding Tofu's case directed the IJ to make "further findings consistent with this decision." J.A. 298. There is no language in the federal asylum statute restricting factual inquiry on remand, and taking additional testimony appears to fall squarely within the IJ's authority. *See* 8 U.S.C. § 1229a(b)(1) ("The [IJ] shall . . . receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."). Therefore, we find no error in the IJ's decision to take additional testimony.

**E.**

16

While Tofu may have technically waived any challenge to the agency's denial of CAT protection by not explicitly raising the issue in his initial appellate brief, we will nonetheless overlook any waiver and evaluate his argument. *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 249 (4th Cir. 2013) ("'[I]n rare circumstances, appellate courts, in their discretion, may overlook [the rule that appellants abandon arguments that they do not raise in their opening briefs].'" (quoting *A Helping Hand, LLC v. Balt. Cty.*, 515 F.3d 356, 369 (4th Cir. 2008))).

The IJ found that Tofu did not demonstrate a greater than fifty percent likelihood that he would be tortured if returned to Bangladesh. J.A. 53–54. We believe that substantial evidence supports this determination.

Tofu's supporting affidavits mention the possibility that he might be tortured upon returning to Bangladesh. *E.g.*, J.A. 157. However, Tofu does not claim that the Bangladeshi government or individuals acting under the "consent or acquiescence of a public official" ever tortured him or directly threatened him with torture. *See* 8 C.F.R. § 1208.18(a)(1) (torture entails the intentional infliction of "severe pain or suffering, whether physical or mental," in order to obtain information, punish or intimidate). Country condition evidence shows that police and security forces in Bangladesh frequently use violence to suppress political protests and that the Bangladeshi police have occasionally tortured political prisoners. *See, e.g.*, J.A. 215, 602–03. But Tofu was never imprisoned while living in Bangladesh. The record evidence also suggests that the Awami League government is working to limit politically-motivated prosecutions and curtail the torture of political prisoners. J.A. 606; *see also* J.A. 181 (describing government efforts to prevent torture).

Because we are not compelled to conclude that Tofu is more likely than not to be tortured in Bangladesh, we affirm the IJ's denial of Tofu's CAT claim.

## IV.

For the reasons stated above, we deny the petition and affirm the BIA's order.

*PETITION DENIED*